******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.
******************************************************

STATE OF CONNECTICUT *v.* BERNARD
A. BRANDON
(SC 20371)

Robinson, C. J., and McDonald, D'Auria, Mullins,
Ecker, Keller and Bright, Js.*

*Syllabus*

Convicted of manslaughter in the first degree with a firearm in connection
with the shooting death of the victim, the defendant appealed to this
court. The defendant, who had been serving probation for a prior convic-
tion, was at a gambling club, where he and the victim engaged in a
heated argument after the victim did not pay the defendant money he
believed he was owed. Later that night, the victim called the defendant's
phone, apologized, and suggested that they meet for drinks. The defen-
dant then drove to a local bar and parked his car near the victim's car.
After the defendant and the victim exited their respective vehicles, the
defendant shot the victim multiple times. Before trial, the defendant
moved to suppress, inter alia, statements that he had made to the police
during two recorded interviews. The first interview took place several
days after the shooting, right after the defendant attended a regularly
scheduled meeting with his probation officer at the probation office. At
the conclusion of that meeting, the probation officer told the defendant
that some individuals who wished to speak with him were waiting in
her supervisor's office, which was in a locked area of the building. The
defendant then was escorted to that office, where he was interviewed
for ninety minutes by two plainclothes police officers, without being
advised of his rights pursuant to *Miranda* v. *Arizona* (384 U.S. 436).
After the first twenty-one minutes of that interview, during which the
defendant admitted to a version of events that placed him near the bar
at the approximate time of the shooting, the officer told the defendant
that he was free to leave and that he was not under arrest. The officers
advised the defendant at least five more times that he was free to leave,
but he did not terminate the interview or leave the room. The interview
continued, and, after the officers pressed the defendant, he changed his
story, implicated another individual, O, in the shooting, and used his
cell phone to find O's phone number, which he read out loud to the
officers. At the conclusion of the interview, the officers seized the defen-
dant's cell phone and arranged to meet with him later that evening for
the second interview, which took place in an interrogation room at the
police station. The police advised the defendant of his *Miranda* rights
at the outset of the second interview, and, at the end of that interview,
the defendant left without being placed under arrest. In support of his
motion to suppress, the defendant argued that his statements during
the first interview should be suppressed on the ground that it was a
custodial interrogation and that the police violated his rights by failing
to provide him with *Miranda* warnings prior to the interview. The
defendant challenged the admission of statements made during the sec-
ond interview, contending that that interview violated the principle
that the provision of *Miranda* warnings midstream, after a suspect
has offered a confession during a custodial interrogation, violates the
constitutional requirements safeguarded by *Miranda*. The trial court
denied the defendant's motion to suppress the statements that he made
during his first and second interviews, concluding that the first interview
was not custodial and, therefore, that the rule pertaining to midstream
*Miranda* warnings was inapplicable with respect to the second inter-
view. On the defendant's appeal from the judgment of conviction, *held*:

1. The trial court properly denied the defendant's motion to suppress the
   statements he had made during the first interview because, notwithstand-
   ing the coercive elements of that interview, a reasonable person in the
   defendant's position would not have believed that he was restrained to
   a degree associated with a formal arrest, and, therefore, the defendant
   was not in custody during that interrogation:

   The defendant was questioned in a coercive environment insofar as the

interview was conducted by two armed police officers in a secured area of the probation office, immediately after the defendant's mandatory meeting with his probation officer, no one told the defendant that the individuals waiting to speak to him were police officers, the officers made it clear during the interview that the defendant was the prime suspect, and the officers seized the defendant's cell phone at the end of the interview, but a coercive environment, without more, does not establish that the interview was custodial.

In light of the totality of the circumstances, this court was persuaded that the coercive elements of the first interview were offset by other factors and did not rise to the degree of restraint associated with a formal arrest, as the record did not reveal that the probation officer had ordered the defendant to meet with the police officers, that the defendant had objected to the meeting, that the defendant had told the probation officer that he did not have time to attend, or that the defendant had asked the probation officer if he was obligated to go, and the simple fact that the defendant was on probation was insufficient to render any request from his probation officer coercive.

Moreover, the application of the factors identified in *State* v. *Mangual* (311 Conn. 182) that a court should consider in evaluating whether an individual is in custody for *Miranda* purposes to the facts of the present case further supported the conclusion that the defendant was not restrained to a degree associated with a formal arrest during the first interview.

Specifically, the nature, extent and duration of the questioning, as well as the length of the defendant's detention, weighed against a conclusion that he was in custody because the tone and tenor of the interview were cordial, insofar as the officers never raised their voices, and both the interview and the detention of the defendant lasted for only ninety minutes.

The factors relating to the number of officers present during the interview, whether they were armed, displayed their weapons, or used force, and whether the defendant was physically restrained, when viewed together, weighed against a conclusion that the defendant was in custody because, although the interrogating officers displayed their badges and guns and had handcuffs, there were only two of them, they did not physically threaten or restrain the defendant, handcuff him, use force, or brandish their weapons, and the defendant presented no evidence that the circumstances surrounding the interview were akin to those surrounding the police station interrogations at issue in *Miranda*.

The fact that, after the first twenty-one minutes of the interview, the police officers repeatedly advised the defendant that he was free to leave and that he was not under arrest, and the fact that the defendant chose to remain and never asked to leave, also weighed against a conclusion that the defendant was in custody, insofar as those facts suggested an exercise of free will, rather than restraint to a degree associated with a formal arrest, and, although the officer's advisements would have weighed even more heavily in favor of a conclusion that the defendant was not in custody if they had been given at the outset of the interview, a failure or delay to advise a defendant that he is free to leave or not under arrest does not necessarily result in a finding of custody, especially when the defendant in the present case left the interview without being placed under arrest.

Although the facts that the police initiated the encounter by making arrangements with the probation office and that no one told the defendant that the individuals waiting to meet him were law enforcement officers weighed modestly in favor of a conclusion that the defendant was in custody, such a conclusion was undercut by the defendant's acquiescence to the meeting, and, although the defendant's probation officer had told the defendant that certain individuals wished to speak with him, she did not order the defendant to attend the meeting or use coercive language, and, thus, a reasonable person in the defendant's position would not have felt restrained to a degree associated with a formal arrest.

The location of the interview in the probation office provided some support for the defendant's contention that he was in custody, insofar as the defendant needed to be escorted into the building in which the

probation office was located and the secured areas therein, but there was no evidence concerning the character of the office in which he was interviewed or concerning whether any limitations were placed on the defendant's ability to leave the building or the secured areas therein.

Furthermore, although the defendant's status as a probationer who was questioned in the probation office may have contributed to the coercive aspects of the interview, it did not transform a noncustodial interrogation into a custodial one, especially when the defendant was not ordered to meet with the police officers, the questioning occurred only after the mandated meeting with the probation officer had concluded, and the police officers informed the defendant that he was free to leave and was not under arrest.

With respect to the degree to which the defendant was isolated during the interview, the fact that the police officers chose to conduct the interview in a secured area of the probation office was offset by the defendant's familiarity with the probation office and his failure to introduce evidence regarding the character of the building and how the probation office was situated therein, and the fact that the defendant's cell phone was seized was of no consequence because he did not establish that it was seized prior to the final few minutes of the interview, and the record demonstrated that he used his cell phone during the interview to search for O's contact information rather than that he was prevented from using the phone to contact anyone.

2. The trial court properly denied the defendant's motion to suppress the statements that he had made during the second interview, that court having correctly determined that the defendant was not in custody during the first interview, and the defendant's challenge with respect to the second interview having been predicated on his claim that he was in custody during the first interview.

*(One justice concurring separately; two justices dissenting in one opinion)*

Argued January 20—officially released December 30, 2022**

*Procedural History*

Amended informations charging the defendant with the crimes of murder and criminal possession of a pistol or revolver, brought to the Superior Court in the judicial district of Fairfield, where the court, *E. Richards, J.*, denied in part the defendant's motion to suppress certain evidence; thereafter, the charge of murder was tried to the jury before *E. Richards, J.*; verdict of guilty of the lesser included offense of manslaughter in the first degree with a firearm; subsequently, the state entered a nolle prosequi as to the charge of criminal possession of a pistol or revolver, and the court, *E. Richards, J.*, rendered judgment in accordance with the verdict, from which the defendant appealed to this court. *Affirmed.*

*Aaron J. Romano*, for the appellant (defendant).

*Timothy F. Costello*, senior assistant state's attorney, with whom, on the brief, were *Joseph T. Corradino*, state's attorney, and *David R. Applegate*, senior assistant state's attorney, for the appellee (state).

*Opinion*

MULLINS, J. The principal issue in this appeal is whether the defendant, Bernard A. Brandon, was in custody when police officers interrogated him in the office of probation following a routine meeting with his probation officer. The defendant appeals from the judgment of conviction, following a jury trial, of manslaughter in the first degree with a firearm in violation of General Statutes § 53a-55a (a).[1] The defendant claims that the trial court improperly denied his motion to suppress the statements he made during two separately recorded interrogations of him by police officers.[2]

As to the first interrogation, which occurred on February 16, 2016, sometime between 11 a.m. and noon, at the Bridgeport Office of Adult Probation, the defendant contends that, because the police failed to advise him of his rights pursuant to *Miranda* v. *Arizona*, 384 U.S. 436, 478–79, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), the interrogation violated his rights under the fifth and fourteenth amendments to the United States constitution. As to the second interrogation, which occurred later on the same day, at approximately 6 p.m., at the Bridgeport Police Department, the defendant claims that, notwithstanding the fact that the officers had issued *Miranda* warnings at the outset of that interrogation, it was tainted by the alleged illegality of the first interrogation.[3] We disagree. After review, we have determined that the first interrogation was not custodial, and, therefore, that *Miranda* warnings were not required. Consequently, the failure to provide them did not violate the defendant's rights and did not taint the second interrogation. Accordingly, we conclude that the trial court properly denied the defendant's motion to suppress the statements he made during the two interrogations and, therefore, affirm the judgment of the trial court.

The jury reasonably could have found the following facts.[4] In the afternoon of February 11, 2016, the defendant and the victim, Javoni Patton, were rolling dice with a number of other persons at an establishment called the Jamaican Gambling Club, near the intersection of Park Avenue and Vine Street in Bridgeport. The defendant believed that the victim was doing well in the games; he estimated that the victim had won $4000 that afternoon. By contrast, the defendant had lost between $400 and $500.

At some point that afternoon, the victim told the defendant that he had just won $20,000 at a casino and had purchased a Mercedes-Benz (Mercedes) with his winnings. The victim then placed a set of Mercedes key fobs on the table. The defendant picked them up and claimed he saw "E55" on the key fobs. When the victim later stated that the Mercedes was an E550, the defendant said he was wrong—it was an E55. They initially

wagered $500 over the dispute, which became heated. When they turned the key fobs over, the defendant claimed, they saw "E55" on one side and "E550" on the other. The defendant continued to believe he had won the bet but offered to accept only $100 in payment from the victim. The victim did not pay the defendant any money.

After leaving the club, the victim called the defendant's phone three times, between 8:15 and 8:23 p.m. The defendant told the police that, when he and the victim spoke over the phone at 8:23 p.m., the victim apologized for his earlier conduct and suggested that they meet for drinks at the Thirty Plus Social Club, a bar known as Robin's, located at the intersection of Connecticut and Stratford Avenues in Bridgeport.

The defendant left the Jamaican Gambling Club sometime around 8:27 p.m. He drove to Robin's, where the victim waited in his Cadillac, which was parked at the intersection between Connecticut and Stratford Avenues. The defendant parked his Audi near the victim's car, after which he and the victim both exited their vehicles. The defendant shot the victim multiple times, hitting him in the chest, the right hand and in the back of both legs. The victim died from the gunshot wound to his chest. The defendant drove away.

Three recorded interviews of the defendant by the police featured heavily in the state's case against him. The first interview took place in the probation office in Bridgeport on February 16, 2016, immediately following the defendant's regularly scheduled meeting with his probation officer. The police conducted the second interview approximately five hours later, in the police station. The third interview took place two days later, in an unmarked police car in a Burger King parking lot. Before trial, the defendant moved to suppress all of the statements he made during the three interviews. Following a hearing on the motion, the trial court denied the motion to suppress as to the first two interviews and granted it as to the third. Subsequently, during trial, defense counsel notified the court that, without waiving the objection to the introduction of the defendant's statements during all three interviews, in light of the court's denial of the motion to suppress the statements that the defendant made during the first two interviews, he would offer the statements made during the third interview in order to provide context for the first two.

The state charged the defendant with murder in violation of General Statutes § 53a-54a (a) and criminal possession of a pistol or revolver in violation of General Statutes (Supp. 2016) § 53a-217c (a) (1).[5] Following the trial, the jury found the defendant not guilty of murder but guilty of the lesser included offense of manslaughter in the first degree with a firearm. The state subsequently entered a nolle prosequi as to the charge of criminal possession of a pistol or revolver. The trial court sen-

tenced the defendant to twenty-seven years of incarceration. This appeal followed.

We begin by observing that, because the state does not challenge the trial court's determination that the first interview constituted an interrogation, that question is not before us in this appeal. Our sole task is to resolve whether the defendant was in custody during that interrogation. That is, as we explained, the defendant's challenge to the trial court's denial of his motion to suppress as to both the first and second interviews rests on his assertion that he was in custody during the first interrogation. Accordingly, our conclusion that the trial court correctly determined that the defendant was not in custody during the first interrogation is the dispositive issue in this appeal. The following facts, which either were found by the trial court or are undisputed, are relevant to this issue.[6]

On February 16, 2016, the defendant, who was serving probation for a prior domestic violence conviction, reported to the probation office in Bridgeport for his regularly scheduled meeting with his probation officer, Shavonne Calixte. In order to meet with Calixte, the defendant had to pass through several layers of security. When members of the public enter the building where the probation office is located, they must pass through a metal detector and security check in the first floor lobby in order to access the elevators to the floors occupied by the probation office, which include at least the second and third floors of the building.[7] The offices on the second and third floors are within locked areas; probationers may enter only with the assistance of an escort. The record is silent as to whether a member of the public may leave without the assistance of an escort upon the conclusion of his or her business with the probation office. Although there was testimony at the suppression hearing that a member of the public could not enter the secure areas on the second and third floors of the probation office without being provided with an escort, there was no testimony that egress from those areas is similarly restricted.

The defendant met with Calixte in a reporting room on the third floor. At the conclusion of their meeting, Calixte told the defendant that some persons who wished to speak with him were waiting on the second floor, in the office of her supervisor, Peter Bunosso.[8] Although she could not recall whether she expressly told the defendant that he did not have to meet with the unidentified persons, Calixte was certain that she did not tell him he was obligated to speak to them.[9] She escorted the defendant to the second floor, where they met Bunosso.

Bunosso then escorted the defendant to his office, which was within a locked area. Two police officers, Lieutenant Christopher LaMaine and Detective Ada Curet, waited in the office for the defendant. Bunosso

did not remain for the interrogation. He removed some work files, left and closed the door behind him. No member of the probation office was present for the interrogation.

LaMaine testified that, on the day of the interrogation, he wore plain clothes and that both his badge and his gun were visible. Curet was dressed similarly, also with a badge and gun visible. Although LaMaine and Curet both had handcuffs, LaMaine was uncertain whether the defendant could see them. Neither of the officers brandished their weapons, used their handcuffs, or restrained the defendant in any way during the interrogation. The defendant sat closest to the door, and at no time during the interrogation did the officers block the door. No testimony was offered regarding the size of the office.

The interrogation lasted about ninety minutes. LaMaine, who asked most of the questions during the interrogation, began by informing the defendant that he and Curet were "talking to people" who knew the victim. During the first approximately twenty-one minutes of the interrogation, LaMaine elicited the defendant's initial account of the events on the night of the shooting.

Specifically, the defendant told the police that, in the afternoon on the day of the shooting, he and the victim had both been rolling dice at the Jamaican Gambling Club. He admitted that, while there, he and the victim engaged in a heated argument over the particular model of the Mercedes that the victim claimed to have purchased with money he had won at a casino.

The defendant initially claimed that he left the club before the victim did. He left alone, he said, in his blue 2004 Audi, sometime between 7 and 7:30 p.m. At around 8 p.m., he claimed, he arrived at another gambling establishment, Old Timers, or "Mr. B's," on Stratford Avenue, between Carroll and Wilmot Avenues. He claimed that he parked his car in front of Old Timers and was inside the establishment when emergency vehicles passed by at around 8:36 p.m. Soon afterward, he and some friends walked to a nearby liquor store, Jimmy's Liquors, where one of the group had parked his truck. They got into the truck and, while they were driving around, noticed the taped off area at Robin's. At around that time, a member of the group received a phone call informing him that the victim had been shot. The defendant said that he retrieved his car from the front of Old Timers sometime around 9 p.m., and then drove to his girlfriend's house.

After the defendant provided this account of his movements, LaMaine began questioning him in greater detail regarding the nature of his dispute with the victim at the Jamaican Gambling Club. He asked the defendant to provide details regarding who saw the dispute, how

heated it became, and whether it escalated into a physical confrontation. LaMaine then confronted the defendant with the fact that the victim subsequently called him and asked the defendant to meet him at Robin's. The defendant admitted that he received the phone call and acknowledged that the victim had asked to meet there, but the defendant denied that he went "down that way." When LaMaine reminded the defendant that "there's a camera at [the intersection of] Stratford and Hollister," the defendant admitted that he had "most likely" taken a right onto Stratford Avenue from Hollister Avenue and then turned at the intersection between Stratford and Connecticut Avenues, a route that took him directly past Robin's, which is at the intersection between the two streets. LaMaine then added, "at . . . 8:33." When the defendant hesitated, LaMaine said, "I'm just telling you what the camera showed." LaMaine again stated that the defendant turned from Stratford Avenue onto Connecticut Avenue at 8:33 p.m. This time, the defendant said, "I guess so." That admission placed the defendant in front of Robin's at the approximate time of the shooting, albeit only momentarily.

LaMaine pressed the defendant further, obtaining an admission from him that, based on his 8:23 p.m. phone conversation with the victim, the defendant knew, when he drove past Robin's at 8:33 p.m., that the victim was there. The defendant continued to maintain, however, that he "rolled down through there," and he did not see the victim.

LaMaine then said: "He was parked right there. And you stopped for, well, two minutes, [one and one-half minutes], almost two minutes. You did. And then you continued on. And there's a lot of cameras, both at Stratford and Connecticut [Avenues]. I'm not even talking about the ones we own. There's a lot of cameras, [on] just about every store, building, even Robin's. If you have a chance, [and] you go by, you'll see a camera right there. You'll see a camera. It's on the Stratford [Avenue] side. And then, right next to it, [there] is a place called . . . Derek's Auto Parts. It's the building that abuts right up against Robin's. And they have cameras on both sides. Stratford and Connecticut [Avenues]. You can go back, I mean, there's an endless number of cameras. Every store has a camera. . . . Yeah. And that's not even counting our good ones. And our cameras are so good [that] we can read license plates, because we know that's why we're going to be using them. So, this is what brings us to you. You went there. And there's also people in the bar. You've been in that bar. . . . So, you know [that] next to the window . . . there's a window as big as this . . . waist high. And they can see out. . . . Now, I'm not going to tell you I know everything that was said. And there was a dispute, and [the victim] was hot. But you and him got into a little thing there. And we just want to

hear your side of it."

When the defendant responded, "[y]eah . . . on Park Avenue," LaMaine said: "No. . . . I'm talking about where he was shot. Maybe he brought a gun. Maybe you took it from him. All I know is that you and him got into a dispute at his car. That's why we're here. Okay. And we want to hear your side of it. *You're not going out of here in handcuffs. Okay. You're not. You're going to walk out of here. Nothing you say is going to get you arrested today.* Okay. We're here to get to the truth, and that's our only job." (Emphasis added.)

Less than thirty seconds later, LaMaine told the defendant that, if he wanted to, he could "walk away right now . . . ." LaMaine and Curet advised the defendant five additional times that he was free to leave. Most of those warnings were within five minutes after the first advisement. Specifically, in the five minutes after LaMaine first told the defendant that he was not under arrest and was free to leave, he also stated: "[y]ou can leave right now if you want"; "[n]o matter what you say, you're going to walk out of that door"; "[y]ou can walk out right now"; and "[l]ike I said, you're free to go." At a later point in the interrogation, Curet reminded the defendant that he was going to "walk out this door."

Approximately one third of the way through the interrogation, LaMaine began to make clear to the defendant that, if he left without providing the police with information to the contrary, he would remain their prime suspect, and they would likely seek a warrant for his arrest. He also suggested that, if the defendant provided that information sooner rather than later, his account would likely be deemed more credible. For example, after the fifth time LaMaine advised the defendant that he could leave the interrogation, he also said that, if the defendant left, "we gotta go on the facts we have. There's just the two of you there. . . . [S]omehow [the victim] gets shot when it's just the two of you. . . . [W]e're probably gonna be writing a murder warrant for you. And, down the road, you might want to say, okay, well, I want to tell my side of the story, like . . . he pulled a gun or something. . . . But it's gonna not sound very credible because everybody, when they're jammed up, says, 'oh, well, let me tell you, this is self-defense, or he pulled a gun.' . . . But it just won't be credible because, yeah, everybody comes up with it once they're arrested."

The defendant did not choose to terminate the interrogation or to leave the room after any one of the advisements that he could leave or walk out. Thus, LaMaine continued to press him for information. As part of LaMaine's interrogation strategy, he emphasized the incriminating effect of the video footage, telling the defendant that "the video doesn't lie" and reminding the defendant that, because it was bitterly cold on the night of the shooting, virtually no one else would be

captured on the outdoor video footage. At the same time, LaMaine misrepresented what the video footage depicted. For example, LaMaine told the defendant that the video showed the defendant driving away while the victim ran and staggered into the middle of the road, then collapsed almost at the Stratford line. Our review of the record does not reveal any such video footage.

About thirty-five minutes into the interrogation, the defendant abandoned his initial story, beginning with his admission that he had, in fact, stopped at Robin's. LaMaine drew a rough map of the immediate area surrounding the bar and asked the defendant to indicate where he parked. The defendant pointed to a spot on the map that placed his car immediately behind where the victim's car had been parked, "bumper to bumper," as LaMaine described it. Both LaMaine and Curet then emphasized to the defendant that, according to his current account, he was the only person, other than the victim, in the vicinity when the victim was shot—that meant that he was the one who shot the victim.

At that point, the defendant stated that he was not alone. He now claimed that a person named Outlaw, who also had been gambling at the Jamaican Gambling Club that afternoon, had accompanied him when he left the club. He said that Outlaw rode in the passenger seat. According to the defendant, when he stopped his car at Robin's, Outlaw jumped out of the car, saying that he was going to get money that the victim owed him. At that time, the defendant had opened his door on the driver's side, and cracked a cigar open, emptied it, then rolled a blunt in it. While he was still rolling his blunt, the defendant heard multiple gunshots. Outlaw got back into the car. The defendant dropped him off a short distance from Robin's, on Connecticut Avenue, and then drove away.

Both LaMaine and Curet expressed doubts regarding the veracity of the defendant's story. The officers told him that he had not adequately explained why, if the victim owed Outlaw money, Outlaw had made no attempt to recover the debt while he and the victim were both at the Jamaican Gambling Club, particularly given that the victim had won a significant amount of cash over the course of the afternoon.

Nevertheless, LaMaine then asked the defendant for Outlaw's real name, his address, his phone number, and his physical description. The defendant claimed not to know Outlaw's real name or his address. At LaMaine's request, the defendant scrolled through his contacts on his cell phone for Outlaw's information, then read the phone number out loud to LaMaine. He also provided the police with a physical description of Outlaw. Although LaMaine and Curet continued to call into question the defendant's account of the events of that evening, the defendant insisted that Outlaw had been present at the scene and had shot the victim. At the end of the

interrogation, LaMaine informed the defendant that, because he had indicated that he communicated with Outlaw on his phone, the police were seizing the defendant's cell phone. Also at the end of the interrogation, the defendant agreed to come to the police station for a second interview, in order to identify Outlaw from photographs drawn from the police department's database. The defendant left the interrogation without being placed under arrest.

The second interrogation took place on the same day, at about 6 p.m., in an interrogation room at the Bridgeport police station. At the outset of the interview, Detective Robert Winkler and Curet advised the defendant of his rights pursuant to *Miranda*. During the second interview, Winkler, LaMaine and Curet obtained some additional details from the defendant. For example, the defendant explained that the initial amount that he and the victim wagered was $500, but, after they discovered that one side of the keys said "E55" and the other side said "E550," the defendant offered to accept $100. He also told the police officers that the coat he was wearing during the interview was the same coat he wore on the night of the shooting.[10] Additionally, he identified a photograph of Troy Lopes as the person known to him as Outlaw. For the most part, however, during the second interview, the police officers asked the defendant to review the account he had provided to them during the first interview. At the end of the interview, the defendant left without being placed under arrest.

Two days after the first two interviews, the defendant initiated the third interview, which took place in an unmarked police car in the parking lot of a Burger King in Stratford. LaMaine and Curet sat in the front seats. The defendant sat in the back seat. The defendant claimed that he feared for his safety because Outlaw had contacted him regarding the defendant's cooperation with the police. When LaMaine and Curet questioned him regarding contradictions in his story implicating Outlaw in the shooting death of the victim, the defendant asked, "[d]o I need to just go get a fucking lawyer?" Rather than clarifying whether the defendant was invoking his right to counsel, LaMaine and Curet continued questioning him. Eventually, the defendant exited the car, thus ending the interview. He left without being placed under arrest.

Prior to trial, the defendant moved to suppress his statements in all three interviews. The defendant argued that the first interview was a custodial interrogation and that the officers violated his rights by failing to provide him with *Miranda* warnings prior to the interview. Relying on his argument that the first interrogation was custodial, the defendant challenged the admission of the second interview on the basis that it violated the rule set forth in *Missouri* v. *Seibert*, 542 U.S. 600,

124 S. Ct. 2601, 159 L. Ed. 2d 643 (2004). Specifically, in *Seibert*, the United States Supreme Court held that the provision of *Miranda* warnings midstream, after a suspect had provided a confession during a custodial interrogation, violated the constitutional requirements safeguarded by *Miranda*. See id., 604 (opinion announcing judgment). The trial court denied the defendant's motion to suppress the statements that he made during his first and second interviews. See footnote 2 of this opinion.

Pertinent to the issues presented in this appeal, the trial court made the following rulings. As to the first interview, the court concluded that, although it was an interrogation, a reasonable person in the defendant's position would not have believed that he was in custody. In arriving at that conclusion, the court reviewed the totality of the circumstances and emphasized the following: the interrogation lasted only ninety minutes; the police did not physically restrain the defendant at any time and did not brandish their weapons; LaMaine, whose testimony the court credited, characterized the interrogation as cordial; the police told the defendant multiple times that he was free to leave; and, in fact, at the end of the interrogation, the defendant left. As to the second interview, the court explained, because the first interrogation was not custodial, *Seibert* was inapplicable, and, therefore, the defendant's challenge with respect to the second interrogation failed as well.

"[T]he standard of review for a motion to suppress is well settled. A finding of fact will not be disturbed unless it is clearly erroneous in view of the evidence and pleadings in the whole record . . . . [W]hen a question of fact is essential to the outcome of a particular legal determination that implicates a defendant's constitutional rights, [however] . . . our customary deference to the trial court's factual findings is tempered by a scrupulous examination of the record to ascertain that the trial court's factual findings are supported by substantial evidence. . . . [When] the legal conclusions of the court are challenged, [our review is plenary, and] we must determine whether they are legally and logically correct and whether they find support in the facts [found by the trial court] . . . ." (Internal quotation marks omitted.) *State* v. *Jackson*, 304 Conn. 383, 394, 40 A.3d 290 (2012).

This court previously has summarized the principles that govern our review of this issue. "To establish entitlement to *Miranda* warnings . . . [a] defendant must satisfy two conditions, namely, that (1) he was in custody when the statements were made, and (2) the statements were obtained in response to police questioning." *State* v. *Mangual*, 311 Conn. 182, 192, 85 A.3d 627 (2014). "The defendant bears the burden of proving custodial interrogation." (Internal quotation marks omitted.) *State* v. *Jackson*, supra, 304 Conn. 417. As we noted, only

the question of whether the defendant was in custody during the first interrogation is before us in this appeal.

"Although [a]ny [police] interview of [an individual] suspected of a crime . . . [has] coercive aspects to it; *Oregon* v. *Mathiason*, 429 U.S. 492, 495, 97 S. Ct. 711, 50 L. Ed. 2d 714 (1977); only an interrogation that occurs when a suspect is in custody heightens the risk that statements obtained therefrom are not the product of the suspect's free choice. *Dickerson* v. *United States*, 530 U.S. 428, 435, 120 S. Ct. 2326, 147 L. Ed. 2d 405 (2000). This is so because the coercion inherent in custodial interrogation blurs the line between voluntary and involuntary statements . . . ." (Internal quotation marks omitted.) *State* v. *Mangual*, supra, 311 Conn. 191.

In *Miranda*, the United States Supreme Court defined a custodial interrogation as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda* v. *Arizona*, supra, 384 U.S. 444. Subsequently, the court has significantly narrowed the meaning of a restraint on freedom of action or movement. See, e.g., C. Weisselberg, "Mourning *Miranda*," 96 Cal. L. Rev. 1519, 1540–42 (2008). In *California* v. *Beheler*, 463 U.S. 1121, 103 S. Ct. 3517, 77 L. Ed. 2d 1275 (1983), the court limited the category of restraints on freedom of movement to those "of the degree associated with a formal arrest." Id., 1125. The court has rejected the proposition that an interrogation of a suspect in a police station, an office of probation, or even of an incarcerated person in a prison, is necessarily custodial. See, e.g., *Howes* v. *Fields*, 565 U.S. 499, 502, 132 S. Ct. 1181, 182 L. Ed. 2d 17 (2012) (prison); *Maryland* v. *Shatzer*, 559 U.S. 98, 112–13, 130 S. Ct. 1213, 175 L. Ed. 2d 1045 (2010) (prison); *Minnesota* v. *Murphy*, 465 U.S. 420, 433, 104 S. Ct. 1136, 79 L. Ed. 2d 409 (1984) (office of probation); *Oregon* v. *Mathiason*, supra, 429 U.S. 495 (police station). Rather, the paramount consideration for whether a suspect is in custody is whether the circumstances can "fairly be characterized as the functional equivalent of formal arrest"; *Berkemer* v. *McCarty*, 468 U.S. 420, 442, 104 S. Ct. 3138, 82 L. Ed. 2d 317 (1984); or, put another way, "whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*."[11] *Howes* v. *Fields*, supra, 509.

"As used in . . . *Miranda* [and its progeny], custody is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion. [Id., 508–509]. In determining whether a person is in custody in this sense . . . the United States Supreme Court has adopted an objective, reasonable person test . . . the initial step [of which] is to ascertain whether, in light of the objective circumstances of the interrogation . . . a reasonable person [would]

have felt [that] he or she was not at liberty to terminate the interrogation and [to] leave. . . . [Id., 509]. Determining whether an individual's freedom of movement [has been] curtailed, however, is simply the first step in the analysis, not the last. Not all restraints on freedom of movement amount to custody for purposes of *Miranda*. [Accordingly, the United States Supreme Court has] decline[d] to accord talismanic power to the freedom-of-movement inquiry, *Berkemer* [v. *McCarty*, supra, 468 U.S. 437], and [has] instead asked the additional question [of] whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*. . . . *Howes* v. *Fields*, supra, [565 U.S.] 509." (Citations omitted; footnote omitted; internal quotation marks omitted.) *State* v. *Mangual*, supra, 311 Conn. 193.

In other words, "[o]nce the scene is set and the players' lines and actions are reconstructed, the court must apply an objective test to resolve the ultimate inquiry: was there a formal arrest or restraint on freedom of movement of the degree associated with formal arrest." (Internal quotation marks omitted.) *J. D. B.* v. *North Carolina*, 564 U.S. 261, 270, 131 S. Ct. 2394, 180 L. Ed. 2d 310 (2011). Put simply, it is not enough that a reasonable person under the circumstances would not have thought that he was free to leave. As one court has explained, "[u]nder *Berkemer* [v. *McCarty*, supra, 468 U.S. 420], the question [in a custody inquiry] is *not* whether a reasonable person would believe he was not free to leave, [but] rather whether such a person would believe he was in police custody of the degree associated with formal arrest." (Emphasis in original; internal quotation marks omitted.) *Bates* v. *United States*, 51 A.3d 501, 510 n.22 (D.C. 2012). "Any lesser restriction on a person's freedom of action is not significant enough to implicate the core fifth amendment concerns that *Miranda* sought to address." *State* v. *Mangual*, supra, 311 Conn. 194–95.

In *Mangual*, this court identified the following, non-exhaustive list of factors to consider in evaluating the totality of the circumstances to determine whether a defendant has satisfied his burden of establishing that he was in custody for purposes of *Miranda*: "(1) the nature, extent and duration of the questioning; (2) whether the [defendant] was handcuffed or otherwise physically restrained; (3) whether [law enforcement] officers explained that the [defendant] was free to leave or not under arrest; (4) who initiated the encounter; (5) the location of the interview; (6) the length of the detention; (7) the number of officers in the immediate vicinity of the questioning; (8) whether the officers were armed; (9) whether the officers displayed their weapons or used force of any other kind before or during questioning; and (10) the degree to which the [defendant] was isolated from friends, family and the public." Id., 197.

With these principles in mind, we examine the totality of the circumstances to determine whether the defendant was in custody during the first interrogation. It is undisputed that the defendant was neither handcuffed nor placed under formal arrest at any point prior to or during the first police interrogation. Thus, the question is whether the police otherwise restrained him to a degree associated with a formal arrest; that is to say, was his restraint the functional equivalent of a formal arrest? Assessing all the circumstances, we conclude that a reasonable person would not have believed that he was restrained to such a degree.

It is undeniable that the defendant was questioned in a coercive environment. Two armed police officers conducted the interrogation in a secured area in the probation office, immediately after the defendant had finished his required meeting with his probation officer. Additionally, it appears that no one told the defendant that the individuals waiting to speak to him were police officers. During the interrogation, the officers made it clear to the defendant that he was their prime suspect. Finally, at the end of the interrogation, the officers seized the defendant's cell phone.

As we explained in our review of the controlling principles, however, a coercive environment, without more, does not establish that an interrogation was custodial.[12] The United States Supreme Court has stated that "[a]ny interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system [that] may ultimately cause the suspect to be charged with a crime. But police officers are not required to administer *Miranda* warnings to everyone whom they question." *Oregon* v. *Mathiason*, supra, 429 U.S. 495. The ultimate inquiry in a custody determination is always "whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." (Internal quotation marks omitted.) *Yarborough* v. *Alvarado*, 541 U.S. 652, 662, 124 S. Ct. 2140, 158 L. Ed. 2d 938 (2004). Our review of the facts persuades us that the coercive elements of the interrogation were offset by other factors and did not rise to the degree of restraint associated with a formal arrest.

In summary, we conclude that, notwithstanding the coercive elements of the interrogation, the following facts demonstrate that the defendant was not restrained to the degree associated with a formal arrest and, therefore, was not in custody during the interrogation. The record does not reveal that Calixte ordered the defendant to meet with the police officers. Instead, according to Calixte's uncontroverted testimony at the suppression hearing, following the conclusion of the defendant's mandatory meeting with her, she informed the defendant that, "if he had a moment," he could meet

with "someone else" who wished to speak with him. The defendant did not introduce any evidence that he objected to the meeting, told Calixte that he did not have time, or asked her if he was obligated to go despite her clear statement that their mandatory meeting was over. The defendant could have left. He did not. There is no indication in this record that Calixte would not have honored the defendant's request if he said he did not have a moment and declined to attend the meeting.

Simply being on probation is insufficient to render any request from one's probation officer coercive. See, e.g., *United States* v. *Ruggles*, 70 F.3d 262, 265 (2d Cir. 1995) (considering fact that probation officer did not tell defendant that he was obligated to speak with law enforcement officers as weighing against conclusion that defendant was in custody), cert. denied, 516 U.S. 1182, 116 S. Ct. 1284, 134 L. Ed. 2d 229 (1996). As we explain hereinafter, in order to support his claim that his status as a probationer created a level of coercion that compels the conclusion that he was in custody, the defendant had to demonstrate that Calixte ordered him to attend the meeting.[13] He failed to make that showing.

In fact, after Calixte told him that the mandatory meeting was over, and that he could meet with the waiting persons "if he had a moment," the defendant accompanied Calixte to meet with the unidentified persons. Upon seeing that the individuals who were waiting for him were members of law enforcement, the defendant elected to remain in Bunosso's office. The defendant did not end the ninety minute interrogation, notwithstanding the repeated reminders from the police officers that he was free to leave and was not under arrest. The officers did not handcuff the defendant, physically threaten him, or attempt to physically restrain him or otherwise restrict his movement. The tone of the interrogation was not hostile. Although the officers seized his cell phone at the end of the interrogation, the defendant was able to freely use his phone during the interrogation, specifically, when, midway through the interrogation, he accessed, from his cell phone contacts, the phone number for "Outlaw," the man he accused of committing the crime. Finally, at the end of the interrogation, the defendant left without being placed under arrest and agreed to meet with the officers again, later that same day, at the police station. Our review of the various *Mangual* factors only fortifies our conclusion that the defendant was not restrained to a degree associated with a formal arrest. We discuss those various *Mangual* factors in greater detail individually.[14]

Turning to the first *Mangual* factor, we begin with the trial court's finding that the tone and tenor of the interrogation were cordial. The trial court stated, during the suppression hearing, that it had reviewed the audio

and video recordings of the three interrogations. The court's factual finding, therefore, is based on its own review of the evidence, as well as its finding that LaMaine's testimony that the first interrogation was cordial was credible. We defer to the credibility findings of the trial court. See, e.g., *Jones* v. *State*, 328 Conn. 84, 101, 177 A.3d 534 (2018).

Moreover, to the extent that the trial court's finding regarding the tone of the interrogation is predicated on its own review of the audio recording of the first interview, that finding is equally entitled to deference. See, e.g., *State* v. *Griffin*, 339 Conn. 631, 669, 262 A.3d 44 (2021) ("[a] trial court's findings are entitled to deference, even if they are predicated on documentary evidence that this court is equally able to review for itself on appeal"), cert. denied,     U.S.    , 142 S. Ct. 873, 211 L. Ed. 2d 575 (2022); see also, e.g., *State* v. *Lawrence*, 282 Conn. 141, 157, 920 A.2d 236 (2007) ("it would be improper for this court to supplant its credibility determinations for those of the fact finder, regardless of whether the fact finder relied on the cold printed record to make those determinations").

Consistent with the trial court's finding, we note, from our own review of the recording of the first interrogation, that at no point during that interrogation did either of the police officers raise their voices. Courts have noted that such a tone and tenor weigh against a conclusion that a defendant was in custody. See, e.g., *United States* v. *Guerrier*, 669 F.3d 1, 5–6 (1st Cir. 2011) (in concluding that interview in unmarked police car with parole officer and two members of law enforcement was not custodial, "relatively calm and nonthreatening" nature of questioning weighed against finding that defendant was in custody); see also, e.g., *United States* v. *Edrington*, 851 Fed. Appx. 574, 577 (6th Cir. 2021) ("consensual tone and tenor of the meeting [with the defendant's probation officer and federal agents] weigh[ed] against a finding of custody" (internal quotation marks omitted)).

The duration of the interrogation, ninety minutes, also weighs against a conclusion that the defendant was in custody in the present case. Indeed, this court has concluded that an interview of two and one-half hours did not "necessitate the conclusion that a reasonable person would believe [the defendant] could not leave, particularly in light of the repeated reminders he received that he was free to leave at any time." *State* v. *Pinder*, 250 Conn. 385, 414, 736 A.2d 857 (1999). Other courts also have considered an interview of this length to weigh against a conclusion that a defendant was in custody. See, e.g., *Stechauner* v. *Smith*, 852 F.3d 708, 715–16 (7th Cir.) (ninety minute interview "was relatively short"), cert. denied,     U.S.    , 138 S. Ct. 194, 199 L. Ed. 2d 130 (2017); *United States* v. *Galceran*, 301 F.3d 927, 931 (8th Cir. 2002) ("the ninety-eight minute

length of the interview [did] not indicate police domination"). But see, e.g., *United States* v. *FNU LNU*, 653 F.3d 144, 154–55 (2d Cir. 2011) (although court ultimately concluded that defendant was not in custody, interview's duration of ninety minutes was among factors that weighed in favor of finding of custody). The duration of the interrogation was the same as that of the detention. Accordingly, the sixth *Mangual* factor, the length of the detention, also weighs against concluding that the defendant was in custody. See *State* v. *Pinder*, supra, 414.

We next consider the second, seventh, eighth and ninth *Mangual* factors, which, when viewed together, weigh against a conclusion that the defendant was restrained to a degree associated with a formal arrest. There were only two police officers in the interrogation room. The defendant was neither handcuffed nor physically restrained in any way. There is also no evidence that, if the defendant had sought to move, the officers would have restricted his movement. In fact, the defendant sat closest to the door. As we observed, there was no testimony regarding the size of the office. Nor was there testimony as to whether the door was locked. There was no evidence regarding where the officers were in relation to the defendant, other than that they were farther away from the door than the defendant. It was the defendant's burden to establish those facts in support of his claim. He failed to present any evidence that the circumstances within the room created an atmosphere similar to that associated with the station house interrogations at issue in *Miranda*. Although both officers were armed, were equipped with handcuffs, and wore visible badges, neither of them physically threatened the defendant, used force, handcuffed him, or brandished their weapons.[15]

Turning to the third *Mangual* factor, we consider it significant that, in the present case, after the first twenty-one minutes of the interrogation, LaMaine and Curet repeatedly advised the defendant that he was free to leave and that he was not under arrest. Courts have held that these advisements weigh heavily against the conclusion that a defendant was in custody for purposes of *Miranda*. See, e.g., *Howes* v. *Fields*, supra, 565 U.S. 515 ("[m]ost important, [the defendant] was told at the outset of the interrogation, and was reminded again thereafter, that he could leave and go back to his cell whenever he wanted"); *United States* v. *Roberts*, 975 F.3d 709, 716 (8th Cir. 2020) (informing suspect that he is free to terminate interview is "powerful evidence that a reasonable person would have understood that he was free to terminate the interview" (internal quotation marks omitted)), cert. denied,     U.S.    , 141 S. Ct. 2822, 210 L. Ed. 2d 942 (2021); *United States* v. *Martinez*, 795 Fed. Appx. 367, 371 (6th Cir. 2019) ("[w]hether investigators inform a suspect that he is free to leave or to refuse to answer questions is the most important

consideration in the *Miranda* custody analysis"); *United States* v. *Ollie*, 442 F.3d 1135, 1138 (8th Cir. 2006) (Advisement provided to the defendant, that he was not under arrest, somewhat mitigated custodial nature of the interview, but "an explicit assertion that the person may end the encounter is stronger medicine. Such a statement provides an individual with a clear understanding of his or her rights and generally removes any custodial trappings from the questioning.").

Despite those repeated advisements, the defendant chose to remain. Indeed, not once during the interrogation did the defendant ask to leave. See, e.g., *State* v. *Lapointe*, 237 Conn. 694, 727, 678 A.2d 942 (defendant's failure to ask to leave weighed against finding of custody), cert. denied, 519 U.S. 994, 117 S. Ct. 484, 136 L. Ed. 2d 378 (1996). We agree with the United States Court of Appeals for the Eighth Circuit, which observed: "Against a backdrop of repeated advice that he was free to terminate the interview, [a defendant's] decision not to terminate the interview and to allow the interview to proceed to its closing suggests an exercise of free will, rather than restraint to a degree associated with formal arrest." *United States* v. *Czichray*, 378 F.3d 822, 829 (8th Cir. 2004), cert. denied, 544 U.S. 1060, 125 S. Ct. 2514, 161 L. Ed. 2d 1109 (2005).

Certainly, if LaMaine had informed the defendant at the outset of the interrogation that he was not under arrest or that he was free to leave, these advisements would have weighed even more heavily in favor of concluding that the defendant was not in custody.[16] By the time that LaMaine first informed the defendant that he was free to leave, the defendant already had implicated himself by claiming, in direct contradiction to his earlier representations, that he drove past the crime scene within minutes of the shooting. We appreciate that the provision of these advisements would have been even more effective had the police officers given them at the start of the interrogation. The timing of these advisements in the present case, however, does not eliminate the powerful effect of LaMaine's direct advisements: "[y]ou can walk away right now if you want"; "[y]ou can leave right now if you want"; "[n]othing you say is going to get you arrested today"; and "[y]ou're free to go." Under most circumstances, it would be difficult to conclude that a reasonable person, upon hearing those words, would nonetheless feel restrained to a degree associated with a formal arrest.

Indeed, we note that, although the provision of these advisements weighs heavily against concluding that a defendant was in custody for purposes of *Miranda*, the failure to provide them, or, as in the present case, a delay in providing them, does not necessitate the opposite conclusion. This court has, in fact, recognized that, as long as the facts demonstrate that a reasonable person in the defendant's position would understand that

his meeting with law enforcement is consensual, a defendant need not be "expressly informed that he [is] free to leave" in order for a court to conclude that the defendant has failed to prove that an interrogation was custodial. *State* v. *Greenfield*, 228 Conn. 62, 72 n.10, 634 A.2d 879 (1993); see, e.g., id., 71–72 n.10 (although police did not expressly inform defendant that he was free to leave, trial court could reasonably have found, given facts of case, that defendant understood that meeting was consensual); see also, e.g., *United States* v. *Ingino*, 845 Fed. Appx. 135, 138 n.1 (3d Cir. 2021) ("[a]lthough the [state] troopers did not explicitly tell [the defendant] he was 'free to leave,' they did not have to speak magic words for it to be clear that he was not under arrest and was free to leave").

Drawing the conclusion that an interrogation was custodial from the failure to advise—or, in the present case, a delay in advising—a defendant that he is free to leave or not under arrest misunderstands the two-pronged nature of the *Miranda* custody inquiry. As the United States Supreme Court has explained, to establish custody, a defendant must prove both that a reasonable person would not have felt free to terminate the interview or to leave; see *Yarborough* v. *Alvarado*, supra, 541 U.S. 663; and that "there is a formal arrest or restraint on [the] freedom of movement of the degree associated with a formal arrest." (Internal quotation marks omitted.) Id., 662. Accordingly, establishing that a reasonable person would not have felt free to leave is a necessary, but not a sufficient, condition to satisfy the defendant's burden of proving that his interrogation was custodial. See, e.g., *Howes* v. *Fields*, supra, 565 U.S. 509 ("[o]ur cases make clear . . . that the freedom-of-movement test identifies only a necessary and not a sufficient condition for *Miranda* custody" (internal quotation marks omitted)); see also, e.g., *State* v. *Powers*, 203 Vt. 388, 405, 157 A.3d 39 (2016) (observing, in context of interrogation in probation office, that fact that probationer was not free to leave was necessary, but not sufficient, condition of custody).

Indeed, the cases in which courts have concluded, notwithstanding law enforcement officers' statements to a defendant that he was free to leave, that a defendant was subjected to custodial interrogation, typically have involved extreme circumstances that compelled the conclusion that the defendant was in custody; none of which exist in the present case.[17] See, e.g., *United States* v. *Newton*, 369 F.3d 659, 675–77 (2d Cir.) (defendant was in custody, despite being told that he was not under arrest, when he was handcuffed after six law enforcement officers entered his apartment and he remained handcuffed during entire interrogation), cert. denied, 543 U.S. 947, 125 S. Ct. 371, 160 L. Ed. 2d 262 (2004); see also, e.g., *United States* v. *McKany*, 649 Fed. Appx. 553, 554–55 (9th Cir. 2016) (defendant was in custody at time of interrogation, notwithstanding being told he

was free to leave or to terminate interview, when law enforcement officers entered his home at 6:30 a.m. in full tactical gear and with weapons drawn, fourteen officers were ultimately involved in executing search warrant, and defendant was handcuffed and escorted to bathroom prior to interrogation and then isolated from others during interrogation).

In the present case, at the end of the interrogation, consistent with the repeated advisements that he was free to leave, the defendant left without being placed under arrest. This fact weighs against the conclusion that the defendant was restrained to the degree associated with a formal arrest. See, e.g., *United States* v. *Galceran*, supra, 301 F.3d 931 ("[l]ack of arrest is a 'very important' factor weighing against custody"). The United States Supreme Court has explained why this particular factor is relevant to the custody inquiry: the "release of the [suspect] at the end of the questioning" is one of the factors relevant to the determination of how a suspect would have gauged his freedom of movement—that factor, therefore, bears on whether a reasonable person would have felt free to leave during the interview. *Howes* v. *Fields*, supra, 565 U.S. 509; see also, e.g., *Oregon* v. *Mathiason*, supra, 429 U.S. 495 (defendant was not in custody when, "[a]t the close of a [one-half hour] interview [the defendant] did in fact leave the police station without hindrance"). Indeed, this court also has considered the fact that a defendant was permitted to leave at the conclusion of an interrogation as a factor weighing against a finding that the defendant was in custody. *State* v. *Lapointe*, supra, 237 Conn. 727, 733–34 (fact that defendant was allowed to leave upon completion of interviews, which lasted for more than eight hours, weighed against finding of custody).[18]

Because the police initiated the encounter, the fourth *Mangual* factor weighs modestly in favor of a conclusion that the defendant was in custody. Its weight is undercut, however, by the defendant's acquiescence to the meeting. Specifically, although the police initiated the encounter by making arrangements with the probation office and no one informed the defendant in advance that the individuals waiting for him were members of law enforcement, the defendant was not ordered to meet with them, and, when he discovered that the individuals were police officers, he chose to stay. Calixte testified that, although she could not recall the precise words she used, she disagreed that the substance of what she said to the defendant was: "[C]ome with me, you're going to see my supervisor now." Instead, she testified that she "basically let him know the office visit was concluded. We were done, and we were walking downstairs, but, if he had a moment, he [could] speak to someone else who would like to talk to him." The defendant accompanied Calixte, then Bunosso, to Bunosso's office, where LaMaine and Curet

waited. There is no evidence in the record that the defendant objected to accompanying Calixte to Bunosso's office.

What is clear on this record is that Calixte did not order the defendant to meet with the individuals who waited for him. The lack of coercion in the language that Calixte used to ask the defendant if he was willing to attend the meeting supports the conclusion that a reasonable person in the defendant's position would not have felt restrained to a degree associated with a formal arrest.[19] See, e.g., *Howes* v. *Fields*, supra, 565 U.S. 514 (language used to summon defendant is significant in custody analysis); see also, e.g., *United States* v. *Ruggles*, supra, 70 F.3d 265 (probation officer's failure to tell defendant that he was obligated to speak with law enforcement officials weighed against concluding that defendant was in custody). We believe that the language that Calixte used to frame the defendant's options more than offsets the failure to inform him that the individuals waiting for him were members of law enforcement. See, e.g., *United States* v. *Edrington*, supra, 851 Fed. Appx. 577 (probation officer's lie in summoning defendant to interrogation with federal agents "weigh[ed] only modestly in favor of custody" (internal quotation marks omitted)); see also, e.g., *United States* v. *Guerrier*, supra, 669 F.3d 4–6 (defendant was not in custody when members of law enforcement "camped outside" probation officer's office during defendant's regular meeting but defendant "expressed no qualms about talking with them").[20]

The fifth *Mangual* factor, the location of the interview, also provides some support for the defendant's contention that he was in custody. As we observed, the questioning took place inside the building where the probation office is located. In arguing that he was in custody during the interrogation, the defendant relies on both the secure nature of the building and the requirements imposed on him as a probationer, namely, that he was required to meet with his probation officer and to comply with her orders.

Regarding the secure nature of the building, we already noted that, although the record is clear that, in order to enter the building, as well as the individual secured areas, the defendant needed to be escorted, the defendant failed to demonstrate, as was his burden, that there were any limitations placed on his ability to leave the secured areas of the building or the building itself. That is, there is no evidence in the record that the defendant had to be escorted out of the secured areas or out of the building itself. Nor did the defendant produce any evidence regarding the size of Bunosso's office, or the size and structure of the surrounding area.[21]

Although the defendant's status as a probationer who was questioned in the probation office may have contributed to the coercive aspects of the interrogation, it

does not transform a noncustodial interrogation into a custodial one. This precise contention has already been addressed by the United States Supreme Court and has been expressly rejected by that court and nearly every other court that has addressed this issue. In *Minnesota* v. *Murphy*, supra, 465 U.S. 420, the United States Supreme Court considered the significance, in the *Miranda* custody analysis, of the locus of an interrogation in a probation office. See id., 431–34. The court began by emphasizing the narrow scope of the concept of custody for purposes of *Miranda*. That is, in the absence of a "formal arrest or restraint on freedom of movement of the degree associated with a formal arrest," a suspect is not in custody for purposes of *Miranda*. (Internal quotation marks omitted.) Id., 430. The court likened a probationer's obligation to appear and be truthful to that of a grand jury witness. Id., 431. The grand jury witness, the court observed, is subject to more intimidating pressure than a probationer, yet the court has never held that *Miranda* warnings must be provided to a grand jury witness. Id. The mere concern that terminating the interview may result in the revocation of probation, the court added, does not render the interview custodial. See id., 433. That type and level of pressure are "not comparable to the pressure on a suspect who is painfully aware that he literally cannot escape a persistent custodial interrogator." Id. Finally, the court observed that, because a probationer attends meetings regularly, over time, a probation office, in contrast to a police station, constitutes familiar surroundings and that familiarity provides some insulation from the "psychological intimidation" that characterizes a custodial interrogation. Id.

In the wake of *Murphy*, the vast majority of decisions from United States courts of appeals considering whether an interrogation conducted in a probation office or involving a probation or parole officer was custodial have answered that question in the negative. See, e.g., *United States* v. *Edrington*, supra, 851 Fed. Appx. 576–78 (defendant was not in custody when probation officer directed him to report to probation office, where defendant was interrogated for fifteen to twenty minutes by federal agents); *United States* v. *Ingino*, supra, 845 Fed. Appx. 137–38 (defendant was not in custody during thirty minute interrogation in probation office by two state troopers, following mandatory meeting with probation officer, when defendant was told he was not under arrest and troopers did not use overt coercion); *United States* v. *Guerrier*, supra, 669 F.3d 4–6 (defendant was not in custody when he was interrogated by two law enforcement officers for twenty to twenty-five minutes in unmarked police car, in presence of parole officer, following regularly scheduled meeting with parole officer); *United States* v. *Aldridge*, 664 F.3d 705, 709, 711–12 (8th Cir. 2011) (defendant was not in custody when ordered by probation officer to report

to courthouse, where he agreed to be questioned by federal agents, and trial court did not clearly err in finding that defendant acquiesced to questioning); *United States* v. *Rainey*, 404 Fed. Appx. 46, 55–56 (7th Cir. 2010) (defendant was not in custody when probation officer and detective brought defendant to probation office, then detectives interrogated her for sixty to ninety minutes), cert. denied sub nom. *Cobb* v. *United States*, 562 U.S. 1236, 131 S. Ct. 1512, 179 L. Ed. 2d 335 (2011), and cert. denied, 563 U.S. 950, 131 S. Ct. 2127, 179 L. Ed. 2d 917 (2011); *United States* v. *Cranley*, 350 F.3d 617, 618–19 (7th Cir. 2003) (interrogation by federal agent in probation office was not custodial); *United States* v. *Howard*, 115 F.3d 1151, 1154–55 (4th Cir. 1997) (defendant was not in custody when federal agents met him at airport, and he agreed to accompany them to probation office for questioning, insofar as, although there was no indication that defendant was told he was free to leave or not under arrest, agents did not handcuff or otherwise restrain defendant or restrict his use of phone); *United States* v. *Ruggles*, supra, 70 F.3d 264 (defendant was not in custody when probation officer scheduled same day meeting at probation office upon request of federal agent, and defendant was told "that he was free to leave, that he was not under arrest, and that he did not have to speak" to law enforcement officials).

Notwithstanding this overwhelming majority of cases, the dissent relies on the only two decisions in which courts concluded that the nexus between a defendant's interrogation and his probation status demonstrated that he was in custody for purposes of *Miranda*. Each case is easily distinguishable from the present case. Both relied on the fact that the defendant's failure to report for questioning would have resulted in a violation of probation. See *United States* v. *Barnes*, 713 F.3d 1200, 1204–1205 (9th Cir. 2013) (defendant was in custody when federal agents interrogated him during specially scheduled, mandatory parole meeting at probation office); *United States* v. *Ollie*, supra, 442 F.3d 1138–40 (defendant was in custody when parole officer ordered him to report for questioning by police chief in police station, defendant testified that he felt obligated to follow parole officer's order, and defendant did not acquiesce to questioning, insofar as his failure to comply would have been violation of parole).

In contrast to both *Barnes* and *Ollie*, in the present case, the defendant was not ordered to meet with law enforcement officers for questioning, and the questioning occurred only after his mandated meeting with his probation officer had ended. Indeed, there is no evidence in the present case that Calixte ever directed the defendant to attend the meeting or that she told the defendant that his probation would be violated if he refused to attend the meeting. Accordingly, we conclude that a reasonable person, under those circum-

stances, would not have believed that refusing to meet with the police officers would result in a violation of his probation.

One of the leading cases in this area, *United States* v. *Cranley*, supra, 350 F.3d 617, shares many factual circumstances with the present case. The court in *Cranley* concluded that, although the interrogation of the defendant, a probationer, occurred in a coercive atmosphere—the probation office—the interrogation was not custodial. Id., 618–19. The defendant's terms of probation required him to report to his probation officer as directed, for both scheduled and unscheduled meetings, and to provide truthful responses to inquiries by his probation officer. Id., 618. At the request of a federal agent, the defendant's probation officer scheduled a meeting with the defendant, so that the agent could question the defendant regarding several guns that the agent had traced to the defendant. Id. The probation officer was present during the one hour interrogation. Id., 619. As in the present case, the interrogation took place in a secure area. Id. Subsequently, the agent met for a second time with the defendant in the same location, this time outside the presence of the probation officer and for at least ninety minutes. Id. At the conclusion of both interviews, the defendant was permitted to leave. See id.

The court recognized that the atmosphere in the probation office was coercive; see id.; but concluded that the facts of the case, as we have summarized them in the preceding paragraph, lacked the "usual indications of police custody . . . ." (Citations omitted.) Id., 620. The court also noted that, like the defendant in the present case, the defendant in *Cranley* failed to establish the character of the building, that is, whether the probation office shared the building with other offices unrelated to law enforcement, which would "mut[e] the impression that the probation service is a branch of the state correctional authority," or, by contrast, with a courthouse, a jail or police station. Id., 619–20. The court in *Cranley* considered it significant that the defendant had not asked whether he was under arrest or free to leave. See id., 620. Had he done so, the court stated, "we would know from the answer whether he was in custody." Id. Given these gaps in the record, the court concluded, *Minnesota* v. *Murphy*, supra, 465 U.S. 433, and the "long list of cases" applying *Murphy*, controlled and precluded a conclusion that the defendant was in custody. *United States* v. *Cranley*, supra, 350 F.3d 620.

A comparison of the facts of the present case and those presented in *Cranley* demonstrates that the facts in *Cranley* weighed more heavily in favor of a finding of custody than those in the present case. Specifically, in *Cranley*, there was no indication that the defendant was ever informed either that he was free to leave or that he was not under arrest. In fact, the court noted

that, before one of the two meetings, the probation officer reminded the defendant of his obligation to answer questions truthfully. Id., 619.

Regarding the absence, in the record, of any evidence that the defendant had been told he was free to leave or was not under arrest, the court observed that the defendant could have "asked the [federal] agent, when the questioning got hot, '[a]m I under arrest or am I free to leave?' Had he done that we would know from the answer whether he was in custody. His failure to ask, given the location of the interview and the absence of the usual indications of police custody, precludes a finding of custody, in light of such cases as *Minnesota* v. *Murphy*, [supra, 465 U.S. 433]; *United States* v. *Humphrey*, [34 F.3d 551, 554 (7th Cir. 1994)]; *United States* v. *Hayden*, 260 F.3d 1062, 1066–67 (9th Cir. 2001) [cert. denied, 534 U.S. 1151, 122 S. Ct. 1117, 151 L. Ed. 2d 1011 (2002)]; *United States* v. *Howard*, [supra, 115 F.3d 1154–55]; *United States* v. *Nieblas*, 115 F.3d 703, [704–705] (9th Cir. 1997); and *United States* v. *Ruggles*, [supra, 70 F.3d 264–65], all closely in point." *United States* v. *Cranley*, supra, 350 F.3d 620.[22]

In the present case, the defendant contends that the seizure of his cell phone demonstrates that the tenth *Mangual* factor, the degree to which he was isolated from friends, family and the public, weighs in favor of finding that he was in custody. We disagree. The defendant's reliance on this argument fails because he did not establish that the cell phone was seized prior to the final few minutes of the interrogation, when LaMaine announced the seizure. In fact, the record demonstrates that halfway through the interrogation, upon LaMaine's request, the defendant searched his phone for information on Outlaw. There is no evidence that the defendant was prevented from using the phone in his possession to send text messages to anyone or even to call anyone. The evidence in the record demonstrates that it was not until the end of the interrogation that LaMaine informed the defendant that, because he had provided Outlaw's phone number from his contacts on his cell phone, and because he had communicated with Outlaw on the phone, they were seizing the phone as part of the ongoing investigation. The defendant's suggestion that the deprivation of his phone supports his contention that a reasonable person would not have felt free to leave under those circumstances is belied by the fact that, within minutes after the seizure, he left.

Despite our conclusion that the seizure of the defendant's cell phone does not weigh in favor of finding that he was in custody, we recognize that many aspects of the tenth *Mangual* factor weigh in favor of a finding that the defendant was in custody. Specifically, the police officers chose the probation office as the location of the interrogation. Therefore, to the extent that the interrogation took place in a secure area, the police took

actions that resulted in the defendant's being isolated during the interrogation. The weight of these facts is offset, however, by two other facts. First, the defendant was familiar with the probation office. Second, the defendant failed to introduce evidence regarding the character of the building—whether the probation office occupied the entire building or shared space with other offices unrelated to law enforcement. See id., 619–20 (relying on defendant's failure to establish character of building where probation office was located in analysis and concluding that interview was noncustodial).

In summary, evaluating the totality of the circumstances, we conclude that the defendant has failed to establish both that a reasonable person in his position would not have felt free to leave and, most important, that there was a restraint on his freedom of movement of the degree associated with a formal arrest. The defendant was not ordered to meet with the police officers; nor was his probationary status threatened. The officers used no physical force or restraint. The defendant failed to establish that he was unable to leave the office without assistance, and he failed to prove that the officers denied him access to his phone prior to its seizure in the final moments of the interrogation. He was told repeatedly that he was not under arrest and was free to leave, yet the defendant continued to talk freely with LaMaine after being so advised. And the defendant did leave—without being placed under arrest.

Accordingly, we conclude that the trial court correctly determined that the defendant was not in custody during the first interview. Because the defendant's challenge to the trial court's denial of his motion to suppress the statements that he made during the second interview is predicated on his claim that he was in custody during the first interview, that challenge fails as well. Indeed, because the first interview was not custodial, the trial court correctly concluded that *Missouri* v. *Seibert*, supra, 542 U.S. 600, was inapplicable to the second interview. See id., 604 (opinion announcing judgment) (identifying issue presented as testing of "a police protocol for custodial interrogation that calls for giving no warnings of the rights to silence and counsel until interrogation has produced a confession"); *United States* v. *Familetti*, 878 F.3d 53, 62 (2d Cir. 2017) (declining to reach defendant's claim based on *Seibert* because defendant "was not subject to a [prewarning] custodial interrogation").

The judgment is affirmed.

In this opinion ROBINSON, C. J., and KELLER and BRIGHT, Js., concurred.

* This case originally was argued before a panel of this court consisting of Chief Justice Robinson and Justices McDonald, D'Auria, Mullins, Kahn, Ecker and Keller. Thereafter, Justice Kahn was removed from the panel, and Chief Judge Bright was added to the panel. He has read the briefs and appendices, and listened to a recording of the oral argument prior to participating in this opinion.

** December 30, 2022, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

[1] The defendant appealed directly to this court pursuant to General Statutes § 51-199 (b) (3).

[2] The trial court granted the defendant's motion to suppress the statements that he made during a third interview, on the basis that, after the defendant made statements that were ambiguous as to whether he was invoking his right to counsel, the police did not attempt to clarify those statements and, instead, continued questioning him. See *State* v. *Purcell*, 331 Conn. 318, 321, 203 A.3d 542 (2019) (holding that article first, § 8, of Connecticut constitution requires that law enforcement personnel clarify ambiguous requests for counsel before continuing interrogation).

[3] The defendant contends that the trial court's denial of his motion to suppress the statements that he made during the first two interviews violated his rights under article first, §§ 8 and 9, of the Connecticut constitution. "[B]ecause the defendant has not provided an independent analysis of his state constitutional claim under *State* v. *Geisler*, 222 Conn. 672, 684–86, 610 A.2d 1225 (1992), we consider that claim abandoned and unreviewable." (Internal quotation marks omitted.) *State* v. *Rivera*, 335 Conn. 720, 725 n.2, 240 A.3d 1039 (2020).

[4] We note that "we review the record in its entirety to determine whether a defendant's constitutional rights were infringed by the denial of a motion to suppress." *State* v. *Kendrick*, 314 Conn. 212, 218 n.6, 100 A.3d 821 (2014); see, e.g., *State* v. *Fields*, 265 Conn. 184, 191, 827 A.2d 690 (2003) ("record on review of ruling on pretrial motion to suppress includes evidence adduced at trial"); see also, e.g., *State* v. *Toste*, 198 Conn. 573, 576, 504 A.2d 1036 (1986).

[5] The state also charged the defendant with carrying a pistol without a permit in violation of General Statutes (Supp. 2016) § 29-35 (a). After the conclusion of evidence, but prior to jury deliberations, the trial court granted the defendant's motion for a judgment of acquittal as to that charge.

[6] See, e.g., *State* v. *Griffin*, 339 Conn. 631, 655 n.12, 262 A.3d 44 (2021) ("Appellate review of the trial court's resolution of a constitutional claim is not limited to the facts the trial court actually found in its decision on the defendant's motion to suppress. Rather, [this court] may also consider undisputed facts established in the record, including the evidence presented at trial." (Internal quotation marks omitted.)), cert. denied,        U.S.        , 142 S. Ct. 873, 211 L. Ed. 2d 575 (2022).

[7] The record is unclear as to whether the probation office occupies the entire building, or, if it does not, what other agencies or offices share the building with the probation office.

[8] The record is unclear regarding whether Bunosso informed Calixte in advance about the individuals who were waiting to speak to the defendant and whether he told her that they were members of law enforcement. The testimony of Calixte and Bunosso is somewhat inconsistent on these points.

Calixte testified that she learned about the individuals only at the end of her meeting with the defendant, as she was "wrapping up . . . ." She also testified that she could not recall whether Bunosso informed her at that time that they were members of law enforcement. All she could say with certainty was that, after the fact, she knew that the individuals who had been waiting to speak to the defendant were police officers.

Bunosso testified that, on February 15, 2016, one day prior to Calixte's meeting with the defendant, he had contacted her to find out the date of the defendant's next meeting. According to Bunosso, during that conversation, consistent with his usual practice in such circumstances, he informed Calixte that the police wished to speak with the defendant afterward. Bunosso also testified that, when the defendant reported for his February 16, 2016 probation meeting, Bunosso informed Calixte that police officers wished to speak to the defendant after that meeting was finished.

In any event, whether Calixte intentionally withheld information from the defendant or was provided with incomplete information is irrelevant to the question of whether the defendant was in custody in the present case. It is undisputed that Calixte did not inform the defendant in advance that the individuals who waited for him were members of law enforcement. Regardless of who withheld that information from whom, the request to the defendant to meet with the law enforcement officers did not inform him of all the relevant information. In our analysis, we discuss the significance of that failure to inform the defendant of the identity of the individuals waiting to speak with him.

[9] At this juncture, the record reveals somewhat ambiguous testimony from Calixte regarding whether, after telling the defendant that the probation

meeting was over, she took the additional step of also telling him, in specific terms, that he had a choice whether to attend the meeting. Specifically, during cross-examination at the suppression hearing, Calixte stated that she did not tell the defendant, "you're going to see my supervisor now." Instead, as she recalled:

"[Calixte]: I basically let [the defendant] know the office visit was concluded. We were done, and we were walking downstairs, but, if he had a moment, he [could] speak to someone else who would like to talk to him.

"[Defense Counsel]: Do you recall whether . . . you gave [the defendant] any choice to—to not—

"[Calixte]: There's always a choice. *Of course, I gave him a choice.*

"[Defense Counsel]: You told him . . . I'm going to take you downstairs now, okay. My supervisor wants to see you, but you don't have to see my supervisor. Is that your recollection?

"[Calixte]: I don't recall. I don't recall." (Emphasis added.)

Although the record reflects that Calixte testified literally that she gave the defendant a choice, because the preceding question was cut off and the follow-up answer to the next question was "I don't recall," there is some ambiguity as to whether Calixte's testimony reflects that she affirmatively told the defendant that he had a choice to attend the meeting. In any event, because the record does not reflect that Calixte in any way coerced the defendant to attend the meeting, her testimony, as a whole, supports our conclusion that the defendant was not forced to attend the meeting.

[10] Because of the defendant's claim, the officers seized his coat.

[11] Any doubt regarding whether the court in *Howes*, by referring to the "type of station house questioning at issue in *Miranda*"; *Howes* v. *Fields*, supra, 565 U.S. 509; referred to an inquiry as to whether the petitioner was restrained to a degree associated with a formal arrest is resolved by referring to the *Miranda* decision itself, which summarized the circumstances of the petitioners in the cases that were before the court in that appeal. Specifically, Ernesto Miranda was arrested, then taken to the police station, where he was interrogated. *Miranda* v. *Arizona*, supra, 384 U.S. 491. Although Michael Vignera was not arrested prior to the start of his interrogation, he was initially picked up by the police, brought in for questioning, placed under formal arrest during the course of the interrogation, then transferred to another precinct, where the interrogation continued. Id., 493. Carl Calvin Westover was arrested, placed in a lineup, booked, and then detained and interrogated over the course of two days. Id., 494–95. Finally, Roy Allen Stewart was arrested at his home, consented to a search of the home, jailed (along with his wife and three other persons who were visiting his home at the time), and interrogated over the course of five days. Id., 497.

[12] Two premises underlying the dissent's argument are contrary to the legal principles that govern the custody analysis. First, the dissent presumes that, because there were some coercive aspects of this interrogation, the defendant was in custody. Second, the dissent devotes little of its analysis to the ultimate inquiry of whether there was a formal arrest or restraint to a degree associated with a formal arrest and, instead, treats the initial inquiry, whether a reasonable person would have felt free to leave, as sufficient to establish that the defendant was in custody. Essentially, the dissent inappropriately collapses the free to leave inquiry with the restraint to the degree associated with a formal arrest inquiry. See, e.g., *Berkemer* v. *McCarty*, supra, 468 U.S. 435–37, 440 (declining to accord free to leave inquiry "talismanic power" and holding, instead, that *Miranda* safeguards are triggered when suspect's freedom is curtailed to degree associated with formal arrest); *People* v. *Begay*, 325 P.3d 1026, 1029–30 (Colo. 2014) ("Under the [f]ourth [a]mendment, a seizure occurs when a reasonable person would not have felt free to leave or otherwise terminate an encounter with law enforcement. . . . [W]hat constitutes custody for *Miranda* is narrower than what constitutes a seizure . . . . [T]he [*Miranda*] question is *not* whether a reasonable person would believe he was not free to leave, but rather whether such a person would believe he was in police custody of the degree associated with a formal arrest." (Citations omitted; emphasis in original; internal quotation marks omitted.)); see also, e.g., 2 W. LaFave et al., Criminal Procedure (4th Ed. 2015) § 6.6 (c), pp. 810–11.

The dissent's discussion of the police officers' threats to arrest the defendant at some point in the future illustrates these flaws in its analysis. The dissent claims: "It cannot seriously be maintained that a threat by the interrogating officers to arrest a suspect in the near future, but not right now, unless the suspect remains and answers questions will have no significant impact on the person's perception that he is truly free to leave." Although

such threats may have an effect on a reasonable person's perception that he is free to leave, overemphasizing those threats suggests that the answer to the free to leave prong of the custody inquiry is dispositive of the question of whether the restraint on the defendant was to the heightened degree necessary for custody. Concluding that the defendant was restrained to a degree associated with a formal arrest because the officers threatened to seek a warrant for his future arrest simply cannot be squared with the facts that he was not ordered to report to the meeting, he was told repeatedly that he could leave, he was not handcuffed or otherwise physically restrained, the interrogation was cordial, and the officers allowed him to scroll through his phone during the interrogation. Indeed, in this particular case, at no point during the interview did either LaMaine or Curet suggest that the defendant would be placed under arrest as an immediate and direct consequence of terminating the interview. In fact, they made the opposite quite clear. Specifically, LaMaine told the defendant, "[n]othing you say is going to get you arrested today," and that, if he wanted to, he could "walk away right now . . . ." They informed the defendant—seven separate times— either that he was free to leave or that he was not under arrest. Those advisements weigh heavily against a conclusion that a reasonable person would have felt that he was restrained to a degree associated with a formal arrest.

[13] The dissent acknowledges that the defendant failed to produce any evidence either that Calixte ordered the defendant to attend the meeting with the police officers or that she threatened him with a violation of probation if he refused. Contrary both to applicable precedent and the allocation of the burden of proof, the dissent reasons that, because the record is ambiguous as to whether Calixte informed the defendant that he was not required to attend, we should infer that a reasonable person in the defendant's position would have believed that she commanded him to attend the meeting. As we explained, the defendant bears the burden of proving custody. *State* v. *Jackson*, supra, 304 Conn. 417. It defies logic, when confronted with an ambiguous record, to draw the inference favorable to the party who bears the burden of proof.

Furthermore, controlling precedent is clear—because "the [s]tate could not constitutionally carry out a threat to revoke probation for the legitimate exercise of the [f]ifth [a]mendment privilege," in the absence of an order from his probation officer, a probationer's fear of revocation of probation for "refusing to answer questions calling for information that would incriminate [him or her] in separate criminal proceedings" is unreasonable and, therefore, does not support the inference that the probationer was coerced. *Minnesota* v. *Murphy*, supra, 465 U.S. 438. Following *Murphy*, the United States courts of appeals have held that, without more, the mere fact that a probation officer requested a defendant to attend a meeting with law enforcement officers does not render an interrogation custodial. Compare *United States* v. *Cranley*, 350 F.3d 617, 618–19 (7th Cir. 2003) (interrogation by federal agent at probation office, arranged by probation officer, was not custodial), with *United States* v. *Ollie*, 442 F.3d 1135, 1138, 1140 (8th Cir. 2006) (defendant was in custody when parole officer ordered him to report for questioning by police chief in police station, and parole officer testified that defendant's failure to comply would have been violation of parole).

[14] Contrary to the dissent's suggestion, we do not apply these factors as a mechanical test, the satisfaction of which automatically satisfies custody. Indeed, as we pointed out, we have little difficulty applying the general principles laid out by the United States Supreme Court and concluding that the defendant has not demonstrated that the circumstances here rose to the level of restraint associated with a formal arrest. Still, we find that reviewing the *Mangual* factors helps to provide a more fulsome examination of the circumstances of the first interrogation.

[15] We fully appreciate that there may be circumstances in which the presence of two law enforcement officers could weigh in favor of finding that a defendant was in custody. As with every factor in the custody inquiry, however, the defendant bears the burden of proving that the number of officers present weighs in favor of a custody finding. The defendant has not, however, demonstrated that the room was particularly small, that the officers flanked him, stood over him, or sat overly close to him, or that the two officers somehow used their numbers to restrict his movements in any way. In the absence of any such showing, we conclude that the rather routine number—two law enforcement officers—weighs against a conclusion that the defendant was in custody. See, e.g., *United States* v. *Woody*, 45 F.4th 1166, 1175 (10th Cir. 2022) (presence of two officers, without more, was

insufficient to demonstrate that reasonable person would not have felt free to decline to speak with officers); *State* v. *Castillo*, 329 Conn. 311, 333, 186 A.3d 672 (2018) (rejecting defendant's contention that presence of three officers in his living room weighed in favor of concluding that he was in custody).

[16] We disagree with the dissent's suggestion that the delay in advising the defendant that he was free to leave and was not under arrest until after he had incriminated himself is somehow analogous to the midstream *Miranda* warnings condemned in *Missouri* v. *Seibert*, supra, 542 U.S. 604 (opinion announcing judgment), and that the police officers' advisements to the defendant that he was free to leave therefore have no place in the custody analysis in the present case because they "fail to convey to a suspect that he has a choice regarding his participation in the interrogation." The dissent has cited no support for this proposition. Our case law supports the opposite conclusion. Two cases in particular are instructive.

In *State* v. *Pinder*, supra, 250 Conn. 385, this court rejected the defendant's claim that the admission of inculpatory statements he made to polygraph examiners violated his fifth amendment right against self-incrimination under *Miranda*. Id., 408. Specifically relevant to the present case, the defendant in *Pinder* contended that, after he told examiners that he had assisted the victim in committing suicide, he was in custody for purposes of *Miranda*. See id., 414. This court rejected that argument, emphasizing that the examiners did not, in response to the defendant's inculpatory statement, "[alter] the circumstances of their interviews of the defendant in such a way that his initial noncustodial status became custodial." (Internal quotation marks omitted.) Id., 415–16; see also *State* v. *Lapointe*, supra, 237 Conn. 727 (defendant's statements implicating himself in crime did not render interviews custodial because police did not alter circumstances of interviews following his admissions).

Similar to *Pinder* and *Lapointe*, in the present case, the police officers did not alter the circumstances of the interview following the defendant's incriminating statements. In fact, they informed him that he was free to leave or that he was not under arrest—seven times. The dissent's argument that, after he made incriminating statements, the defendant may not have felt free to leave because, in effect, the cat was out of the bag, misses the point of the custody inquiry. The question is not whether the defendant deemed it a good strategic decision to leave. Rather, the question is whether a reasonable person in the defendant's position would have believed that his freedom of movement was constrained to the degree associated with a formal arrest.

[17] The dissent asserts that "free to leave advisements must be assessed in light of the surrounding circumstances . . . ." Footnote 11 of the dissenting opinion. We agree and have done so. The dissent's attempt to deem the advisements in the present case ineffectual, however, cannot be squared with even the precedent it cites for that proposition. Specifically, the decisions cited by the dissent illustrate that the circumstances in the present case do not involve the type of extreme circumstances under which courts have concluded that, notwithstanding law enforcement officers' advisement to a defendant that he was free to leave, the interrogation was nevertheless custodial. See *United States* v. *Hashime*, 734 F.3d 278, 284 (4th Cir. 2013) (The defendant was in custody despite being told by the police that he was free to leave, when the defendant "had awoken at gunpoint to a harrowing scene: his house was occupied by a flood of armed officers who proceeded to evict him and his family and restrict their movements once let back inside. Throughout the interrogation, [the defendant] was isolated from his family members, with his mother's repeated requests to see him denied."); *United States* v. *Craighead*, 539 F.3d 1073, 1078, 1087–89 (9th Cir. 2008) (defendant was in custody despite being told that he was free to leave when eight armed law enforcement officers wearing flak jackets, some of whom unholstered their weapons, executed search warrant for defendant's home while defendant was interrogated in storage room with closed door, guarded by law enforcement officer).

[18] We acknowledge the tension with placing significant weight on this factor given that a suspect may not know at the outset of or during a particular interrogation whether he will be permitted to leave at the end of the interrogation. However, both the United States Supreme Court and this court have considered this factor in the totality of the circumstances that bear on a custody determination. Thus, although we do not place great weight on this factor, we nevertheless consider it in accordance with long-standing, established precedent in this area.

[19] We disagree with the defendant's contention that, because Calixte was his probation officer, even if she expressly told him he had a choice, the "choice" would be meaningless due to her authority over him and the possible "repercussions" of making a wrong choice. (Internal quotation marks omitted.) First, we note that Calixte testified that, before she informed the defendant that there were people waiting to speak to him, if he had time, *she told him that their mandatory meeting was finished.* Second, as we explain in this opinion, in *Minnesota* v. *Murphy*, supra, 465 U.S. 420, the United States Supreme Court rejected the proposition that the pressure associated with the mere possibility of revocation of probation is "comparable to the pressure on a suspect who is painfully aware that he literally cannot escape a persistent custodial interrogator." Id., 433. As we also explain in this opinion, courts applying *Murphy* have concluded that the threat of revocation of probation weighs in favor of finding that a defendant was in custody only when the probation officer has ordered or directed the defendant to report to an interrogation. See, e.g., *United States* v. *Ollie*, supra, 442 F.3d 1138–40. The defendant presented no evidence that Calixte ordered him to meet with anyone after his meeting with her had ended or that she threatened to report that he had violated his probation if he refused to do so.

[20] We note that, in support of his claim that he was in custody during the first interview, the defendant also relies on the fact that LaMaine and Curet misrepresented the evidence against him during the interrogation. The United States Supreme Court has stated, however, that deceptive interrogation tactics have no bearing on the *Miranda* custody analysis. Specifically, in *Oregon* v. *Mathiason*, supra, 429 U.S. 492, the United States Supreme Court observed that the Oregon Supreme Court had found that a police officer's false statement that the defendant's fingerprints had been discovered at the scene of the crime contributed to the coercive environment of the interview for purposes of *Miranda*. Id., 495. The United States Supreme Court resoundingly rejected that proposition, explaining: "Whatever relevance this fact may have to other issues in the case, it has nothing to do with whether [the defendant] was in custody for purposes of the *Miranda* rule." Id., 495–96.

[21] The dissent states that, "based on the undisputed facts regarding the extent of security in the building, specifically, the requirement of an escort from the entrance of the building to the defendant's meeting with Calixte and the fact that Calixte escorted the defendant to Bunosso's office, a reasonable person in the defendant's position would have believed that he could not leave without assistance." Footnote 7 of the dissenting opinion. The record is silent as to whether he could leave the building unescorted. Presumably, either Calixte or Bunosso could have resolved this question if the defendant had asked them. He did not. Accordingly, notwithstanding the dissent's assertion, we are neither making any factual findings nor "conclud[ing] with certainty" that the defendant was not able to leave the building unescorted. (Emphasis omitted.) Id. Instead, we allocate the burden where it belongs—with the defendant. He did not establish that he was unable to leave without an escort. The lack of clarity in the record does not redound to his benefit in our assessment of whether he was in custody.

[22] Two additional differences between the present case and *Cranley* further demonstrate that the defendant's interrogation was less coercive than that of the defendant in *Cranley*. Unlike the interrogation in the present case, the first interrogation in *Cranley* was conducted during the defendant's scheduled meeting with his probation officer. See *United States* v. *Cranley*, supra, 350 F.3d 618–19. Therefore, unlike the circumstances in the present case, in *Cranley*, the probation officer required the defendant to attend the meeting with the federal agent. See id., 618. Additionally, because the probation officer is the person charged with ensuring that a probationer adheres to the terms of supervised release—one of which, as the defendant in *Cranley* was reminded, is to answer any inquiries truthfully—a reasonable person in that defendant's position would view the probation officer's presence as increasing the pressure not only to answer questions, but also to answer them truthfully during an interrogation. In the present case, Calixte's absence during the defendant's interrogation by LaMaine and Curet decreased the coercive aspects of the questioning.